IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

**DONALD FREEMAN**                                                                                   **PLAINTIFF**

v.                                    Case No. 4:12-cv-00574-KGB

**CITY OF LITTLE ROCK**                                                                     **DEFENDANT**

### ORDER AND OPINION

Plaintiff Donald Freeman brings this action against his employer, the City of Little Rock ("the City"), alleging violations of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq*. Before the Court is the City's motion for summary judgment (Dkt. No. 9). Mr. Freeman has responded (Dkt. No. 16), and the City has replied (Dkt. No. 19). For the following reasons, the City's motion for summary judgment is granted.

**I.   FACTUAL BACKGROUND[1]**

Mr. Freeman has been employed by the Little Rock Fire Department ("LRFD") for 40 years. He has held the rank of Battalion Chief with the LRFD since 2000. Chief Gregory Summers has been the Fire Chief of the LRFD since May 11, 2009. He served as interim Fire Chief from January 1, 2009, until his permanent appointment on May 11, 2009. Prior to being the Fire Chief, Chief Summers served as Assistant Chief for Operations from April 23, 2007, to December 31, 2008. The Assistant Chief for Operations is the direct supervisor of LRFD Battalion Chiefs. The Current Assistant Chief for Operations is Doug Coney, who has held the position since 2009. Within the present structure of the LRFD, there are two Assistant Chiefs— the Assistant Chief for Operations and the Assistant Chief for Administration. The Assistant Chief for Administration is responsible for implementing the LRFD's FMLA policy. The current Assistant Chief for Administration is Don Bradley.

---

[1] These facts are undisputed unless otherwise specifically noted.

In 2007, shortly after Chief Summers was promoted to Assistant Chief for Operations, he conducted a meeting with the LRFD's Battalion Chiefs, during which he presented a PowerPoint presentation and informed the Battalion Chiefs that they would be required to attend a six-day training course at the National Fire Academy in Emmitsburg, Maryland, titled Command and Control Decision Making at Multiple Alarm Incidents.  Mr. Freeman was present for the 2007 meeting and understood that Chief Summers intended for all Battalion Chiefs to attend the training course at the National Fire Academy.  Mr. Freeman contends that, at that meeting, Chief Summers did not place a time limit on when the Battalion Chiefs would attend the training course.  The PowerPoint Chief Summers presented at the meeting states:  "Four BC's per year will be selected to attend the National Fire Academy.  Two per semester . . . . All BC's will get the chance to apply.  My first option is volunteers . . . . If no volunteers, I will select applicants to apply."  (Dkt. No. 9-2, at 9).  Mr. Freeman states that he thought the Battalion Chiefs would be told when they needed to attend the training course (Dkt. No. 16-3, at 5; Dkt. No. 18, at 3).  Mr. Freeman did not apply to attend the training course in 2007 or 2008.  He states that this was because the Battalion Chiefs agreed to let the Battalion Chiefs with less time with the LRFD have the opportunity to attend the training first (Dkt. No. 16-3, at 19-20).

Mr. Freeman applied in December 2009 to attend the training course in 2010 but was not accepted because the class was full.  Mr. Freeman reapplied in 2010 to attend the training course in 2011.  He was notified by letter dated August 2, 2010, that he was accepted for the training course scheduled for February 13-18, 2011.

On July 19, 2010, Mr. Freeman went to his doctor with symptoms of numbness on his face.  Mr. Freeman took off work the next day, July 20, 2010.  Mr. Freeman saw a neurologist, Dr. Thomas, on August 20, 2010, and September 1, 2010.  Dr. Thomas performed tests and

2

informed Mr. Freeman on the second visit that he had suffered a mini-stroke, but Dr. Thomas did not know the cause (Dkt. No. 16-3, at 10). Mr. Freeman was then referred to another doctor, Dr. Baxley, who discovered that Mr. Freeman had a hole in his heart that had caused his stroke. From the record, it appears that Mr. Freeman had a patent foramen ovale (PFO), which is generally defined as a hole between the left and right atria of the heart that fails to close naturally after birth (Dkt. No. 9-4, at 45; Dkt. No. 16-3, at 10). Mr. Freeman was referred to Dr. Mego at the Little Rock Cardiology Clinic, who performed a procedure to repair the hole on September 22, 2010. After the procedure, Mr. Freeman took sick leave for four shifts, between September 24, 2010, and October 3, 2010.

Mr. Freeman testified that, at the time he took sick leave in September and October 2010, he told his supervisor, Chief Coney, that he had suffered a mini stroke and underwent heart surgery. However, Mr. Freeman also testified that he could not remember what he told Chief Coney at the time (Dkt. No. 16-3, at 8-12). In addition, he has admitted in his response to the City's statement of undisputed facts that he did not tell Chief Coney at the time that he was off work because of a stroke or because of heart surgery (Dkt. No. 17, ¶ 29). Chief Coney testified that he asked Mr. Freeman what was "going on" when he was off for the four shifts in September and October 2010 and that Mr. Freeman replied, "You know you can't ask me that." (Dkt. No. 9-6, at 5). Chief Coney further testified that he told Mr. Freeman he was concerned and that the only information Mr. Freeman provided in response was that he was having some numbness in his face (*Id.*).

Mr. Freeman testified that he does not recall turning in a doctor's note or other type of "slip" in regard to the shifts he was off work in September and October 2010. Despite this, he stated that he "is sure" he had to turn in a doctor's note to come back to work because there was

a memorandum of understanding in effect that three absences would require a "sick slip saying you could return to work." (Dkt. No. 16-3, at 14-15). Chief Coney testified that he does not recall asking Mr. Freeman to provide a "sick slip" when he was off for four shifts in the Fall of 2010 (Dkt. No. 9-6, at 15). Chief Coney testified that Mr. Freeman never mentioned a stroke or heart surgery in the Fall 2010 and that, if Mr. Freeman had, Chief Coney would have inquired further because Mr. Freeman operates a Battalion Chief vehicle under emergency conditions; Chief Coney would have had to make sure that Mr. Freeman was capable of returning to work (*Id*.). Mr. Freeman did not take sick leave again in 2010 or 2011 related to his heart condition.[2]

On January 19, 2011, Mr. Freeman sent notice to the National Fire Academy that he would not attend the training course he was scheduled to attend from February 13-18, 2011. Mr. Freeman did not inform Chief Coney at that time that he canceled the course. Chief Coney did not learn that Mr. Freeman had not attended the training course from February 13-18, 2011, until a staff meeting in January 2012. When Mr. Freemen did tell Chief Coney, Mr. Freeman stated that he did not want to attend the course because he did not want to get stranded in Maryland by winter weather. Mr. Freeman admits that he did not tell anyone at the time his not attending the course was because of an alleged serious health condition (Dkt. No. 16-3, at 16-18). He admits his doctor did not advise him not to go to the course (*Id*. at 13-14). However, he explained that he made the personal decision that he should not get stranded by winter weather away from his doctors. He also stated that, at the time, his memory was not sharp and he did not want to embarrass the LRFD at the training course (*Id*. at 14). Mr. Freeman worked his normal shift and

---

[2] Mr. Freeman took one day of sick leave on January 25, 2011; he stated that this sick leave was not related to his heart but was for a sore throat and sinus problems (Dkt. No. 16-3, at 12-13).

4

normal hours February 13-18, 2011, during the time he had been scheduled to attend the training course.

Mr. Freeman took three days of sick leave on May 13, 16, and 19, 2011, which he attributes to a second outpatient procedure he underwent with Dr. Mego at Arkansas Heart Hospital. The record includes a return-to-work note for Mr. Freeman from Dr. Mego dated May 12, 2011 (Dkt. No. 9-4, at 45-46). The return-to-work note lists a diagnosis of "[p]revious PFO closure" and lists the treatment as "TEE."[3] Mr. Freeman testified that he had been experiencing some tingling in his face and in his right foot and that Dr. Mego performed the outpatient scoping procedure to check and make sure "what he did hadn't come loose." (Dkt. No. 16-3, at 14). Mr. Freeman's May 12, 2011, return-to-work note states that Mr. Freeman could return to work on Friday, May 20, 2011, with no restrictions (Dkt. No. 9-4, at 45). Mr. Freeman stated that he does not know if he told Chief Coney any details about why he had to be off for three days in May 2011 (Dkt. No. 16-3, at 15). Mr. Freeman testified that he did not apply for the 2011 spring or summer application period for the training course because of the May 2011 procedure he underwent with Dr. Mego (Dkt. No. 16-3, at 14). Mr. Freeman reapplied on November 15, 2011, to attend the training course in July 2012.

In the first staff meeting of the year, in January 2012, Chief Summers learned that only Mr. Freeman and one other Battalion Chief, David Wilson, had not yet attended the course. Chief Summers told Mr. Freeman and Chief Wilson that they would be prohibited from working Battalion Chief Assignment ("BCA") days until they attended the training course. BCA days are shifts a Battalion Chief works that are not their normally assignment shifts. When working

---

[3] "TEE" generally stands for transesophageal echo, a type of echo test in which an ultrasound transducer is positioned on an endoscope and guided down the patient's esophagus for examining the heart's valves and chambers.

BCA days, Battalion Chiefs earn a higher rate of pay than their normal rate of pay. As a normal practice within the LRFD, Battalion Chiefs try to maintain approximately the same number of BCA days at any given time. If a Battalion Chief misses an opportunity to work a BCA day, he will be allowed to make up the day to maintain approximately the same number of BCA days as the other Battalion Chiefs. Chief Wilson retired in April 2012 without having attended the training course and worked no BCA time between January 2012 and his retirement. Mr. Freeman attended the training course in July 2012 and was allowed to resume working BCA days upon completing the training.

After completing the training course in July 2012, Mr. Freeman requested that he be allowed to make up the BCA shifts he was not allowed to work between January and July 2012 so that he would have an equal number of BCA days as the other Battalion Chiefs. Mr. Freeman learned by e-mail from Chief Coney on July 30, 2012, that Chief Summers would not grant Mr. Freeman's request to make up the BCA days (Dkt. No. 16-3, at 16).

After Mr. Freeman learned he was not going to be permitted to make up the BCA days, he met with Chief Coney and Chief Bradley and discussed the history of his health condition. Mr. Freeman admits that this was the first time he communicated to Chief Coney that he did not attend the class in February 2011 due to health concerns (Dkt. No. 17, ¶ 56; Dkt. No. 16-3, at 16). After this meeting, Chief Coney informed Chief Summers that Mr. Freeman stated he did not attend the 2011 training course due to health issues and that he did not want to travel during bad weather and risk getting stranded away from his doctor. Mr. Freeman admits that this was the first time Chief Summers received any information that Mr. Freeman attributed his cancellation of the February 2011 class to any reason related to his health (Dkt. No. 17, ¶ 58). Chief Summers refused Mr. Freeman's request to make up the BCA days he missed.

Chief Summers testified that his decision regarding make-up of the BCA days was not motivated in any way by Mr. Freeman's use of sick leave. Chief Summers stated that, in January 2012 when he announced the decision, he originally denied BCA days to motivate Mr. Freeman and Chief Wilson to attend the training class and that he later denied Mr. Freeman's request to make-up the BCA days because Mr. Freeman had not complied with the 2007 order until 2012 and had been working BCA days while other Battalion Chiefs were attending the training course (Dkt. No. 16-1, at 14, 21, 23, 26, 29). In his affidavit, Chief Summers states, "I denied his request because his inability to work BCA days during that time period was the result of his failure to comply with an order I had given five years previously." (Dkt. No. 9-1, ¶ 14). Mr. Freeman contends that Chief Summers's stated reasons for denying BCA days are inconsistent, and he disputes that Chief Summers's decision was not motivated by Mr. Freeman's use of sick leave (Dkt. No. 17, ¶¶ 50, 60).

Assistant Chief Bradley is responsible for FMLA implementation at the LRFD. Employees with the LRFD can exhaust all accumulated sick leave, vacation leave, and any other paid leave before FMLA time is charged. This practice is intended to benefit the employee by resulting in a guaranteed of period of employment for a longer period of time (Dkt. No. 9-7, at 7-8). Mr. Freeman concedes that he never requested FMLA leave from 2010 to the present (Dkt. No. 17, ¶ 66). He also admits that he did not consult the City Administrative Personnel Policy and Procedure Manual to determine how to apply for FMLA leave when he was on sick leave (*Id.*). Mr. Freeman further admits that he did not treat his sick leave as anything other than ordinary sick leave (Dkt. No. 16-3, at 18). However, according to his testimony, he believed that his sick days in September and October 2010 and May 2011 were automatically treated as FMLA leave (*Id*. at 17).

Mr. Freeman filed his complaint on September 7, 2012, alleging that the City, through the LRFD and Chief Summers, violated the FMLA by denying him BCA days between January and July 2012 and by not allowing him to make up those days later.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law." *Celotex*, 477 U.S. at 331.

## III. ANALYSIS

The FMLA entitles a qualifying employee to 12 workweeks of leave during any 12–month period if the employee has "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D); *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012). Upon return from FMLA

leave, an employee is generally entitled "to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C.A. § 2614 (a)(1)(B).

"A claim under the FMLA cannot succeed unless the plaintiff can show that he gave his employer adequate and timely notice of his need for leave . . . ." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 991 (8th Cir. 2005).  The Eighth Circuit has recognized three types of claims arising under two subsections of the FMLA dealing with prohibited acts. *See* 29 U.S.C. § 2615(a)(1), (a)(2).  The three types of claims are:  (1) "entitlement" claims, *see Pulczinski*, 691 F.3d at 1005, or "interference" claims, arising under § 2615(a)(1); (2) "retaliation" claims, arising under § 2615(a)(2); and (3) "discrimination" claims, arising under § 2615(a)(1).  *Brown v. City of Jacksonville*, 711 F.3d 883, 890-91 (8th Cir. 2013) (citing *Pulczinski*, 691 F.3d at 1005–06; *Lovland v. Emp'rs Mut. Cas. Co.*, 674 F.3d 806, 811 (8th Cir. 2012)).

Mr. Freeman's complaint and briefing are not clear as to the specific types of FMLA claims he intends to allege, as the City observes.  His complaint could be construed to allege two types of claims, both arising out of the City's decision not to permit him to make-up certain BCA days.  First, Mr. Freeman asserts that the City failed to afford him benefits under § 2614 (a)(1)(B) of the FMLA by not restoring him to "an equivalent position" (Dkt. No. 1, ¶ 7). Secondly, Mr. Freeman asserts a discrimination claim, alleging that he was denied benefits for a discriminatory reason (*Id.*, ¶ 15).  In addition, in his response to the City's motion for summary judgment, Mr. Freeman also appears to raise a claim for retaliation, although he has not specifically alleged that in his complaint (Dkt. No. 18, at 9-10).  The Court will address all three claims.

### A. Notice Under the FMLA

An employer's duties under the FMLA are not triggered until the employee "provides enough information to put the employer on notice that the employee may be in need of FMLA leave." *Rask v. Fresenius Med. Care N. Am.*, 509 F.3d 466, 471-72 (8th Cir. 2007). The Eighth Circuit has determined that an employee's meeting his or her notice obligation to an employer of a need for FMLA leave is essential to an FMLA entitlement and retaliation claim. *See Bosley v. Cargill Meat Solutions Corp.*, 705 F.3d 777, 783-84 (8th Cir. 2013). "Employees . . . have an affirmative duty to indicate both the need and the reason for the leave, and must let employers know when they anticipate returning to their position." *Scobey v. Nucor Steel-Arkansas,* 580 F.3d 781, 786 (8th Cir. 2009) (quoting *Woods*, 409 F.3d at 990-91). An employee provides adequate notice when he "provides enough information to put the employer on notice that the employee may be in need of FMLA leave." *Thorson v. Gemini, Inc.*, 205 F.3d 370, 381 (8th Cir. 2000). The employee "need not invoke the FMLA by name in order to put an employer on notice." *Id*. The notice must be given 30 days in advance where the approximate need for leave is foreseeable. 29 U.S.C. § 2612 (e)(1)(B). "When the approximate timing of the need for leave is not foreseeable, an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). The Eighth Circuit cases "instruct that the adequacy of an employee's notice requires consideration of the totality of the circumstances and is typically a jury question." *Murphy v. FedEx Nat'l LTL, Inc.*, 618 F.3d 893, 903 (8th Cir. 2010) (citation omitted).

Even if Mr. Freeman would qualify for FMLA leave under these facts, he admits he did not give notice to his employer of his need for FMLA leave. *See* 29 U.S.C. § 2612 (a)(1)(D) (eligible employee entitled to leave "[b]ecause of a serious health condition that makes the

employee unable to perform the functions of the position of such employee."); 29 C.F.R. §§ 825.113, 825.123 (defining serious health condition that makes the employee unable to perform the functions of the employee's job). He cancelled the course on January 19, 2011, yet he admits that he waited until August 2012, after being denied the opportunity to make-up BCA days, to inform his employer that he could not, or felt that he could not, attend the February 2011 training course due to health reasons (Dkt. No. 17, ¶¶ 56-58). At the time he was to attend the course in February 2011, he had not taken off work since October 2010, except for a sore throat in January 2011, and had not yet explained to his employer the nature of his health condition.

      The Court acknowledges that Mr. Freeman testified that he told Chief Coney he had suffered a mini stroke and mentioned heart surgery (Dkt. No. 16-3, at 7-8). However, he also testified that he does not recall what he told Chief Coney about his medical condition in September and October 2010 (Dkt. No. 16-3, at 8-12). In addition, he has admitted in his response to the City's statement of undisputed facts that he did not tell Chief Coney at the time that he was off work because of a stroke or because of heart surgery (Dkt. No. 17, ¶ 29). Mr. Freeman's equivocal and self-contradictory statements do not create a genuine issue of material fact that he gave notice. *See Bosley*, 705 F.3d at 782 ("Pilcher's equivocal and self-contradictory recollections of what she told Crowell fail to show that Bosley gave notice through Pilcher. The only reasonable inference that could be drawn in Bosley's favor is that Pilcher simply did not recall whether she told Crowell that Bosley was depressed.") (where employee sought to show notice through spokesperson); *To v. U.S. Bancorp*, 651 F.3d 888, 892 n.2 (8th Cir. 2011) ("An assertion that a party does not recall an event does not itself create a question of material fact about whether the event did, in fact, occur.").

Drawing all reasonable inferences in Mr. Freeman's favor, the Court concludes that the record evidence does not create a genuine issue of material fact as to notice.

### B. Entitlement Claim

Even if Mr. Freeman satisfied his notice requirement under the FMLA, his entitlement claim would fail. An entitlement claim arises when an employee alleges he has been denied rights under the FMLA. *See Pulczinski*, 691 F.3d at 1006. The Court acknowledges that, "[a]n employee proceeding on this theory need not show that an employer acted with discriminatory intent." *Id.*; *Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 979 (8th Cir. 2005). To demonstrate an entitlement claim, an "employee must show only that he or she was entitled to the benefit denied." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006). The Court finds that Mr. Freeman has not presented a genuine issue of material fact that he was denied a right or benefit afforded to him by the FMLA.

An entitlement claim based on restoration generally arises when an employee allegedly is not restored to an equivalent position when he returns from FMLA leave. 29 U.S.C. § 2614(a). The FMLA provides that the taking of FMLA leave will not result in the loss of any employment benefit accrued prior to the date on which the leave commenced. 29 U.S.C. § 2614(a)(2). Here, Mr. Freeman does not specifically allege that he took FMLA leave and was denied restoration to an equivalent position upon return from leave. Rather, he claims that he was unable to attend a training course in February 2011 because of health conditions and later, because he still had not attended the training course, was informed in 2012 that he could not make-up certain BCA days he missed. Mr. Freeman attended the training course in July 2012 and was permitted to work BCA days again but was not permitted to make-up the BCA days he missed.

As an initial matter, Mr. Freeman was not on sick leave or FMLA leave in February 2011 when he failed to attend the training course. He did not attempt to take leave of any kind on the days he was set to take the course; he worked regular shifts on those days. He does not allege that the City prevented him from taking FMLA leave. *See Brown*, 711 F.3d at 886-87 (concluding that, since the plaintiff did not assert the employer prevented her from taking FMLA leave, she did not have an entitlement claim).

Moreover, even assuming Mr. Freeman could establish that he took leave in 2010 and 2011 that constituted FMLA leave, he has failed to allege or establish that a benefit which accrued prior to the date on which his alleged leave commenced was not restored to him upon his return from leave. The City's decision in 2012 not to permit Mr. Freeman to make-up certain BCA days he missed occurred long after Mr. Freeman took sick leave in 2010 and 2011 and failed to attend the training course in February 2011. Mr. Freeman learned by e-mail from Chief Coney on July 30, 2012, that Chief Summers would not grant Mr. Freeman's request to make up the BCA days. Only after this did Mr. Freeman meet with Chief Coney and Chief Bradley and discuss the history of his health condition. Mr. Freeman admits that this was the first time he communicated to Chief Coney that he did not attend the class in February 2011 due to health concerns. After this meeting, Chief Coney informed Chief Summers that Mr. Freeman stated he did not attend the 2011 training course due to health issues and that he did not want to travel during bad weather and risk getting stranded away from his doctor. Mr. Freeman admits that this was the first time Chief Summers received any information that Mr. Freeman attributed his cancellation of the February 2011 class to any reason related to his health. The Court concludes an FMLA entitlement claim is simply not implicated by these allegations and, therefore, grants the City summary judgment on Mr. Freeman's FMLA entitlement claim.

### C. Discrimination and Retaliation Claims

Construing all allegations in his favor, this Court will examine whether Mr. Freeman asserts an FMLA discrimination or retaliation claim that survives the City's motion for summary judgment. As an initial matter, the City is entitled to summary judgment on Mr. Freeman's discrimination or retaliation claim because Mr. Freeman has failed to meet his notice obligation under the FMLA. *See, e.g.*, *Wierman v. Casy's Gen. Stores*, 638 F.3d 984, 1000 (8th Cir. 2011) ("In order to benefit from the protections of the statute, an employee must provider her employer with enough information to show that she may need FMLA leave.") (quotation, alternations, and citation omitted). Even if Mr. Freeman met the notice requirement, his discrimination or retaliation claim would fail.

The Eighth Circuit in *Pulczinski* described a discrimination claim as one "aris[ing] when an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA." 291 F.3d at 1006. The Eighth Circuit in *Lovland* explained that a retaliation claim arises under the "'discrimination' prohibition of § 2615(a)(2)." *Lovland*, 674 F.3d at 811. Whether characterized as a "discrimination" claim under § 2615(a)(1) or as a "retaliation" claim under § 2615(a)(2), the Eighth Circuit requires proof of the employer's discriminatory intent. *Brown*, 722 F.3d at 891 (citing *Pulczinski*, 691 F.3d at 1007; *Lovland*, 674 F.3d at 811-13).

Such a claim "arises when an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA." *Pulczinski*, 691 F.3d at 1006. To establish a *prima facie* case of FMLA discrimination, an employee must show: (1) that he engaged in activity protected under the Act, (2) that he suffered a materially adverse employment action, and (3) that a causal connection existed between the employee's action and

the adverse employment action. *Id*. at 1007. The requisite proof of discriminatory intent may come from direct evidence or indirect evidence using the *McDonnell Douglas* burden-shifting framework. *Brown*, 711 F.3d at 891; *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–06 (1973).

The Court concludes that Mr. Freeman has not presented a *prima facie* case of FMLA discrimination or retaliation. First, it is not clear that Mr. Freeman has properly alleged a valid claim of discrimination or retaliation. He states twice in his brief that there is a material issue of fact regarding whether Mr. Freeman's medical condition was a motivating factor in Chief Summers's decision to deny BCA days. He cites no authority for the proposition that an FMLA discrimination claim arises from purportedly discriminating on the basis of a medical condition when there is no allegation that the individual exercised or attempted to exercise FMLA rights. To state an FMLA discrimination claim, Mr. Freeman must show that the adverse action was motivated by an exercise or attempted exercise of FMLA rights. *See Pulczinski*, 691 F.3d at 1007.

Assuming without deciding that Mr. Freeman exercised or attempted to exercise his FMLA rights, the Court concludes that Mr. Freeman has failed to establish a *prima facie* case for FMLA discrimination or retaliation because he has not presented evidence of discriminatory intent. Mr. Freeman has not presented any direct evidence that the LRFD "was motivated by his exercise of FMLA rights when it took the adverse actions." *Pulczinkski*, 691 F.3d at 1007. Therefore, he must present indirect evidence of discriminatory intent under the *McDonnell Douglas* burden-shifting framework. *See id*.; *Brown*, 711 F.3d at 891. If he is able to do so, the burden shifts to the City to come forward with evidence of a legitimate, nondiscriminatory reason for the adverse action. *Phillips v. Mathews*, 547 F.3d 905, 912 (8th Cir. 2008). The

City's burden "is not onerous and the showing need not be made by a preponderance of the evidence." *Id*. If the City meets its burden, Mr. Freeman must come forward with evidence that creates a disputed issue of fact as to whether the asserted reason was pretext for discrimination. *Id*.

Mr. Freeman claims that the LFRD's departure from the customary practice of allowing Battalion Chiefs to make up BCA days is sufficient indirect evidence to give rise to an inference of discrimination. The Court is not persuaded that, on these facts, this alone creates an inference of discrimination. Even assuming this gives rise to an inference of discrimination, however, Mr. Freeman's FMLA discrimination claim fails at the pretext stage of the *McDonnell Douglas* analysis.

Chief Summers articulated a legitimate, non-discriminatory reason for denying Mr. Freeman the BCA days and later denying him the chance to make up those days. Chief Summers testified he denied Mr. Freeman's request because he had not yet attended the training course in 2012, five years after Chief Freeman instructed all Battalion Chiefs to attend the course. The City has met its burden, and therefore, the burden shifts to Mr. Freeman to show pretext. *Phillips*, 547 F.3d at 912.

Mr. Freeman offers no evidence to rebut this other than his contention that Chief Summers gave "inconsistent answers" for his reasons for denying the BCA days. The Court rejects Mr. Freeman's contention that these answers are inconsistent. Mr. Freeman has merely pointed to testimony suggesting different reasons that support the City's decision not to permit Mr. Freeman to make-up BCA days — denying the BCA pay as a motivator for Mr. Freeman to attend the course, denying the BCA pay out of fairness to other Battalion Chiefs who were not earning BCA pay on the days they attended the training course, or simply denying the BCA pay

because it took Mr. Freeman five years to comply with the directive to attend the course. The Court concludes that these reasons all relate to the same failure to attend the course and are not contradictory reasons. "Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext." *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 835 (8th Cir. 2002). There is no substantial change where the new explanation "is not different from the reason originally given, but only a slight elaboration of that reason." *Id*. Chief Summers and the City "certainly did not back off the original explanation, but only pointed out an additional aspect of the same behavior." *Id.* Thus, it "is not a substantial change in [the City's] story, and it is not probative of pretext." *Id.*; *see also Phillips*, 547 F.3d at 913.

Therefore, the Court concludes that Mr. Freeman has not carried his burden of showing a genuine issue of material fact regarding whether the City's and Chief Summers's proffered reason for denying Mr. Freeman the ability to make-up certain BCA days was pretext and that the real reason was in retaliation for any exercise or attempted exercise of rights under the FMLA.

The Court concludes that Mr. Freeman has failed to create a genuine issue of fact that the City, through the LRFD and Chief Summers, violated the FMLA in denying Mr. Freeman the ability to make-up certain BCA days.

\* \* \*

For these reasons, the City's motion for summary judgment is granted (Dkt. No. 9). Mr. Freeman's complaint is dismissed with prejudice.

SO ORDERED this the 28th day of August, 2013.

_____
Kristine G. Baker
United States District Judge